UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

WENDY COOPER, PERSONAL                                6:13-CV-0551-TC
REPRESENTATIVE OF THE ESTATE OF
NATHAN S. COOPER, DECEASED

                              Plaintiff,                          ORDER

        v.

THE CITY OF COTTAGE GROVE, et. al,

                              Defendants.

COFFIN, Magistrate Judge:

## **Introduction**

This is an action brought by the Estate of Nathan S. Cooper and his mother, Wendy Cooper,

pursuant to 42 U.S.C. §1983 for the death of Nathan Scott Cooper while he was in the custody of

the Cottage Grove Municipal Jail on May 5, 2012. Named as defendants are the City of Cottage

Grove and eight officers of the Cottage Grove Police Department (Chief Michael Grover,

Commander Scott Shepherd, Officer Carlos Jones, Corporal John Woodke, Commander Dean

Finnerty, Commander Conrad Gagner, Officer Tami Howell, and Officer Jarrod Butler). Presently

Page 1 - ORDER

before the court is a motion for summary judgment brought on behalf of all the defendants.

## Legal Standard

Federal Rule of Civil Procedure 56 allows the granting of summary judgment:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). There must be no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is missing. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). Once the movant has met its burden, the burden shifts to the nonmovant to produce specific evidence to establish a genuine issue of material fact or to establish the existence of all facts material to the claim. Id.; see also, Bhan v. NME Hosp., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991); Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1105 (9th Cir. 2000). In order to meet this burden, the nonmovant "may not rely merely on allegations or denials in its own pleading," but must instead "set out specific facts showing a genuine issue of fact for trial." Fed. R. Civ. P. 56(e).

Material facts which preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. Anderson, 477 U.S. at 248. Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. On the other hand, if, after the court has drawn all reasonable inferences in favor of the nonmovant, "the evidence is merely colorable, or is not

Page 2 - ORDER

significantly probative," summary judgment may be granted. Id.

As noted, the court must draw all reasonable inferences in favor of the nonmovant (i.e., plaintiff) in determining whether summary judgment is appropriate under the circumstances or whether a jury trial is necessary to resolve material issues of fact.


## Statement of Facts

1. Cottage Grove Jail Background

The Cottage Grove municipal jail is located in the basement of the building which houses the Cottage Grove Police Department and the City's municipal courtroom.  Chief Grover is responsible for the jail budget, approving policies and procedures, and is ultimately responsible for the inmates lodged therein and their care.  Commander Shepherd is responsible for the operation of the jail.  The jail does not have dedicated staff whose responsibilities lie completely within the jail.  Instead, patrol officers and investigators are responsible for the jail's daily operation, with officers conducting jail checks approximately once per hour during their shifts.  The jail has eight cells, which can hold up to 16 inmates, and is separated from the Police Department and Dispatch Center by a flight of stairs and a locking door.  In addition to the hourly checks by officers on the inmates, the cells are monitored by cameras and microphones which allow the on-duty dispatcher to see, hear, and speak with inmates.  The Dispatch Center and Police Department are staffed around the clock.

Because of its small size, the jail does not have medical personnel on staff and does not directly provide medical services to inmates.  During the booking process officers perform a visual inspection of each inmate for signs of obvious sickness or injury and ask a series of health questions. If an inmate appears in need of medical attention, policy calls for the police to choose one of three

Page 3 - ORDER

options : 1) call fire department paramedics (EMTs) to the jail to assess the inmate; 2) take the inmate to the local hospital emergency room; or 3) grant the inmate a medical furlough (release from custody) to allow the inmate an opportunity to seek medical care on his/her own.

2.    Events Surrounding the Death of Nathan Cooper

On April 26, 2012, Nathan Cooper was sentenced to serve a sentence of ten days in the Cottage Grove Municipal Jail for a drug-related crime.

On the evening of April 27, 2012, Cooper was vomiting uncontrollably and exhibited a diminished level of consciousness. Officer Howell summoned South Lane County Fire and Rescue EMTs to the jail to evaluate Cooper. A paramedic concluded that he was suffering withdrawals from methadone addiction, and offered to transport him to the local hospital for further evaluation, but Cooper declined. The paramedic estimated Cooper's weight at the time to be 80 kilograms , or 176 pounds. (This is significant, because at the time of Cooper's death early in the morning of May 5, 2012, his weight was 120 pounds.) After the EMTs left the jail, Howell informed Commander Shepherd of the situation and he authorized her to release Cooper on a medical furlough to give him an opportunity to seek medical care. Upon his release, he was told to return to the jail on the morning of April 29, 2012 to resume serving his sentence.

Cooper failed to seek medical care on furlough, nor did he voluntarily return to jail. After police obtained a warrant and located Cooper on April 30, they discovered him with another addict and in possession of heroin, syringes, and drug paraphernalia. In short, he used the furlough to inject drugs, not see a doctor.

On May 1, after being reincarcerated at the jail, Cooper again began vomiting and exhibiting

withdrawal symptoms. At approximately 10 A.M., EMTs were again summoned to the jail, and determined that Cooper was withdrawing from heroin and meth. According to defendants, Cooper declined an offer by EMTs to transport him to the hospital for further evaluation.[1] A paramedic recommended that officers ensure that Cooper stay well hydrated while going through withdrawals. The officers thereafter provided Cooper with bottles of Gatorade, but the evidence does not reveal that any of the officers monitored or verified his actual fluid intake. The paramedic instructed officers to monitor Cooper and transport him to the hospital for evaluation if his symptoms persisted.

Some 10 hours later, (7:47 P.M.), Cooper complained of stomach pains to Officer Woodke and expressly requested medical attention. Woodke summoned EMTs, but the call was canceled before they arrived because Woodke was told by Officer Skaggs that EMTs had evaluated Cooper earlier that day and left instructions to simply give him Gatorade.

The next morning (May 2nd) at approximately 5:30 A.M., Officer Gagner and Jones conducted a jail check. At that time, Cooper asked Gagner what it meant when "you puke up blood." Gagner understood from the question that Cooper had in fact puked up blood, and responded that it usually meant that the throat was irritated from coughing or vomiting. Gagner never made a note of this conversation nor did he relate this conversation to anyone until after Cooper's death.

At approximately 8:45 A.M. that morning, commander Shepherd called Cottage Grove Community Hospital and spoke with an Emergency Department nurse about Cooper, asking her "how long the severe DT (delirium tremors) are gonna go on " and at one point telling her that he "just (didn't) want him to die on me." The nurse commented that "people don't generally die from

---

[1]This is disputed, however, as there is no documentation supporting the refusal (e. g., a completed Refusal of Transport form).

[heroin withdrawals] but they do feel pretty bad," and recommended that Shepherd continue to provide Gatorade for hydration.

The next morning, May 3rd, Cooper was due in court for a hearing regarding his failure to return from furlough. Because Cooper was too sick to ascend the stairs and attend the hearing in the courtroom, the judge, city attorney, and court clerk went down to his cell for the proceedings.[2] Notwithstanding the paramedic's instructions two days earlier that Cooper should be taken to the hospital for evaluation if his symptoms persisted, his condition had worsened but no medical evaluation was provided.

At 4:16 A.M. on Saturday, May 5th, Officer Jarrod Butler found Cooper dead in his cell. Oregon State Medical Examiner Dr. Daniel Davis conducted an autopsy on May 7, 2012 and concluded that Cooper died from aspiration pneumonia, which is a serious and documented complication of opiate withdrawal that is readily treatable with timely medical intervention.[3] He noted in his report that "both lungs demonstrate an advanced bacterial process productive of thick, yellow pus." Dr. Davis' report also describes the cell in which Cooper's body was found as containing "two partially consumed bottles of Gatorade" and a plastic tray of uneaten breakfast food" and that "the toilet contained dark, rusty colored urine." Dr. Michael Miller, plaintiff's medical expert, states that such urine is consistent with significant dehydration, and also opines that protracted vomiting, diarrhea,

---

[2]It does not appear that Cooper was represented by counsel at the hearing, at which he was sentenced to an additional four days in jail for his failure to voluntarily return after his release on medical furlough. It should be noted that his court appearance record reflects his height at 6 foot 1 inch and his weight at 180 pounds.

[3]The Mayo Clinic website informs that aspiration pneumonia occurs when you inhale food, drink, vomit , or saliva into your lungs. It further lists antibiotics as a treatment option for bacterial pneumonia.

and dehydration were contributing factors to his death.  It was noted in the autopsy report that

Cooper weighed "an estimated 120 pounds."

### Legal Analysis

The contours of the constitutional right at issue in this case are well -defined and clear.

Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a]

prisoner's' serious medical needs." Esteller v. Gamble, 429 U.S. 97, 104 (1976).  A medical need

is serious if failure to treat it will result in "significant injury or the unnecessary and wanton

infliction of pain." Jett v. Penner, 439 F. 3d 1091, 1096 (9th Cir. 2006) (quoting McGuckin v. Smith,

974 F.2d 1050,1059 (9th Cir. 1997) overruled on other grounds by WMX Techs,. Inc. V. Miller , (en

banc)).  A prison official is deliberately indifferent to that need if he "knows of and disregards an

excessive risk to inmate health." Farmer v. Brennan , 511 U.S. 825, 837 (1994).  To be liable, "the

official must both be aware of facts from which the inference could be drawn that a substantial risk

of serious harm exists, and he must also draw that inference." Farmer, 511 U.S. at 837.  Even if a

prison official should have been aware of the risk, if he "was not, then [he] has not violated the

Eighth Amendment,  no matter how severe the risk. Gibson v. County of Washoe,290 F.3d 1175,

1188 (9th Cir. 2002).  "Mere negligence in diagnosing or treating a medical condition , without more,

does not violate a prisoner's Eighth Amendment rights." Toguchi v. Chung, 391 f.3d 1051, 1057

(9th Cir. 2004).

In essence, the individual defendants seek summary judgment on the basis  that "[n]o defendant

had any knowledge of plaintiff's serious medical need." Rather, "[t]hey all believed that Mr. Cooper

was suffering from narcotic withdrawals which, while uncomfortable, are not fatal." Defendant City

seeks summary judgment on the basis that "absent a constitutional violation by a municipal

employee, there can be no municipal liability under §1983. " It thus argues that since no individual defendant was deliberately indifferent to any serious medical need of the decedent, the City cannot be constitutionally liable as a matter of law.

Notwithstanding the individual defendants' assertions that they were unaware that Cooper had a serious medical need and thus were not deliberately indifferent in failing to seek appropriate medical care for him, there is sufficient evidence in the record from which a jury could reject their accounts and draw a contrary inference as to each of them.

Before elaborating on each defendant's conduct in the case, it is helpful to set forth a succinct overview of the evidence (in the light most favorable to the plaintiff, as required by the standards for summary judgment as applied to this case).

Shortly after being incarcerated at the Cottage Grove jail, Nathan Cooper began vomiting frequently and uncontrollably. He weighed approximately 176 - 180 pounds on April 27, 2012 when EMTs first were called to evaluate him. Because of his condition, he was released on medical furlough to obtain medical treatment on his own. Instead, he used the opportunity to inject drugs. He was re-arrested and returned to jail. His vomiting continued unabated. Medics were again summoned, and evaluated Cooper as suffering from withdrawal and recommended that officers ensure he stayed well hydrated, and that he be taken to the hospital if his symptoms persisted. Cooper was thereafter provided with Gatorade, but his intake was never monitored. Ten hours after the second EMT response, Cooper complained of stomach pains and expressly requested medical attention. Paramedics were summoned but called off en route because such would have been the second visit that day. His request for medical attention was ignored. The next morning, Cooper informed an officer that he had been vomiting blood. The officer did not report this information to

anyone. There is evidence that, had EMTs been informed of this development, they would have transported him to the hospital for evaluation. On May 5, 2012, Cooper died, having never been seen or evaluated by a medical professional. He weighed 120 pounds at death, a loss of almost 60 pounds in 9 days (April 27-May5). He died of aspiration pneumonia, an easily treatable condition if diagnosed. Other factors that contributed to Cooper's death included protracted vomiting, diarrhea, and dehydration.

I will now summarize the evidence pertaining to the individual defendants as well as the City and its policies and customs.

Officer Gagner

Gagner performed at least ten jail checks on May 1, 2012 and May 2, 2012 while Cooper was in custody. Gagner knew that Cooper was vomiting up blood but did nothing in response, and did not alert anyone to these symptoms until after Cooper died. While Gagner testified that he was not alarmed by this, a jury could infer that vomiting blood demonstrates an obvious serious medical need. Gagner also knew that Cooper was vomiting a lot and that he had been previously furloughed for medical reasons.

Officer Finnerty

Finnerty performed at least twenty-four jail checks on Cooper between April 26, 2012 and the afternoon of May 4, 2012. He was aware that Cooper was "always really sick," and didn't want to eat anything," but concluded that Cooper was a "heroin addict who was sick" and that withdrawals did not merit medical attention. When Finnerty conducted his last jail check on Cooper, he would have weighed approximately 120 pounds, a weight loss of almost 60 pounds since he was booked into jail. Nonetheless, Finnerty never sought a medical evaluation for Cooper.

Page 9 - ORDER

Officer Jones

Jones performed at least fifteen jail checks on Cooper between April 30, 2012 and his death on May 5, 2012. Jones knew Cooper had been evaluated by EMTs and that dehydration was a concern for Cooper. Jones was present with Officer Gagner when Cooper complained of "puking blood." and a jury could infer that he overheard the conversation.    Jones acknowledged that in one jail check he performed included in video footage, he spent only one second in front of Cooper's cell, despite the dark nighttime conditions of the cell and despite the fact that he knew Cooper was exhibiting symptoms of withdrawals, and ill enough to require a special diet and medical attention earlier in the week. The jury may infer that other jail checks by Jones were similarly brief.

Officer Howell

Howell performed at least twelve jail checks between April 26, 2012 and the evening of May 4, 2012 while Cooper was in custody. Howell knew Cooper was suffering from heroin withdrawals and facilitated his medical furlough on April 27, 2012. At the time, she relayed to dispatch that he was vomiting uncontrollably and had a diminished level of consciousness, yet her jail shift log entry indicates that she considered everything to be okay "C4."[4] Despite Cooper's significant weight loss in an eight day period, Howell noted "C4" on no less than twelve jail shift log entries, the last of which was the night before Cooper's death.

Officer Butler

Butler performed at least thirteen jail checks between April 26, 2012 and Cooper's death on May 5, 2012. Butler was aware Cooper was going through withdrawals, was seen by EMTs and required

---

[4]"C4" or "Code 4" was shorthand for "all inmates are okay. Not in any duress. No need for any further attention."

Page 10 - ORDER

additional hydration. Butler similarly noted "C4" throughout all his jail checks on Cooper, despite his deteriorating condition.

Officer Woodke

Woodke performed at least ten jail checks while Cooper was in custody between April 30, 2012 and May 4, 2012, noting nothing out of the ordinary in his jail shift log entries. During one of these checks, Cooper requested medical care, however Woodke ultimately denied his request. Woodke knew Cooper had been furloughed, was in pain, was suffering from withdrawal symptoms including dehydration and vomiting, was thin and unkempt, and needed to remain hydrated. Yet Woodke denied Cooper's express request for medical care.

Commander Shepherd

Shepherd knew Cooper was ill throughout his time in custody. Concerned about Cooper's health, he spoke over the phone with a nurse at the hospital. He summarized his level of concern in his telephone call as "I just don't want him to die on me." Instead of transporting Cooper to the hospital, he had Cooper evaluated by EMTs and authorized his release on medical furlough. When Cooper failed to seek medical care while on furlough and instead injected drugs during his release, Shepherd still failed to obtain medical care on his behalf. Shepherd is in charge of the day to day operations of the jail. He did not provide additional monitoring for Cooper, and ultimately implemented and enforced the department wide practices that a jury could find led to Cooper's death.

Chief Grover

"A supervisor may be liable for an Eighth Amendment violation if he or she was made aware of the problem and failed to act or he or she promulgated or enforced a policy under which the

Page 11 - ORDER

unconstitutional practices occurred." Valley v. Director of Prisons, 2008 WL 436954 at p. 5 (E.D.

Cal 2008); Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).

As Chief, Grover is responsible for the jail budget and approves policies and procedures. The

budget for the entire operation of the jail was $25,750 per year at the time of Cooper's incarceration.

As a matter of policy or practice, officers had three options for ill inmates –take them to the hospital,

call paramedics for evaluation, or release them on medical furlough. A jury could rationally infer

that budget concerns were a priority and that cost savings were a critical factor in the decisions not

to seek medical intervention for Cooper. The essential function of EMTs is to stabilize an ill or

injured person for transport to the emergency room, not to provide medical diagnosis or treatment.

They are not the equivalent of a physician or other medical professional. A medical furlough does

no good if the inmate does not seek medical treatment while on release. In this case, there does not

appear to have been any follow -up, or any policy in place requiring follow-up, by the officers to

determine whether Cooper in fact sought medical care while on furlough. A jury could infer that a

medical furlough was simply (and wrongly) viewed as a substitute for the City's responsibility to

provide, at its expense, medical care to an inmate with serious medical needs.


The City of Cottage Grove

As set forth above, there is enough evidence in the record from which a jury could conclude that

one or more of the individual officers of CGPD are individually liable for the violation of Cooper's

Constitutional right to adequate medical care for a serious medical need while he was incarcerated

at the Municipal Jail. However, even were a jury to find otherwise and return a verdict in favor of

all the individual defendants, the court disagrees with the City's argument that it could not be held

Page 12 - ORDER

liable under §1983 under those circumstances. It has been held that "situations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation." Speer v. Glover, 276 F.3d 980, 986 (8th Cir. 2002) (emphasis supplied).

The Ninth Circuit Court of Appeals has stated:

> a plaintiff can demonstrate that a municipality is responsible for a constitutional tort committed by its employee, even though it did not direct the employee to commit the tort.
> ....
> A plaintiff need not allege that the municipality itself violated its constitutional rights or directed its employees to do so. Instead, a plaintiff can allege that through its *omissions* the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation...However, because Monell held that a municipality may not be held liable under a theory of respondeat superior, a plaintiff must show that the municipality's deliberate indifference led to its omission and that the omission caused the employee to commit the constitutional violation.... To prove deliberate indifference, the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation...
> ....
> To impose liability under Canton[489 U.S. 378 (1989)], a plaintiff must show 1) that a County employee violated [plaintiff's] rights; 2) that the County has customs or policies that amount to deliberate indifference... ; and 3) that these policies were the moving force behind the employee's violation of [plaintiff's] constitutional rights, in the sense that the County could have prevented the violation with an appropriate policy.
>
> ....
>
> A local government body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights.

> A jury may infer that a municipality made such a deliberate choice when a municipal actor disregarded a known or obvious consequence of his action. Whether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question.

Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1186-1195 (9th Cir. 2002)(some citations and quotations omitted).

The events that unfolded in this case, coupled with the backdrop of the City's policies, practices, and procedures , could support a finding of liability against the City even if the jury concludes that no individual officer was "deliberately indifferent" to a serious medical need of Cooper.

In that regard, the declaration of James Sida, plaintiff's expert related to correction practices, cites some of the evidence on which a jury could base a finding of liability against the City, including:

The annual operation budget for the jail ($25,750) which covers everything associated with its operation, including medical expenses for inmates, which he describes as inadequate even for a small facility.

The absence of an officer at all times at the jail when inmates are housed therein who is trained in accordance with Department of Public Safety Standards and Training - Basic Corrections Officer Training.

The lack of a systemic method of logging vital information about health of inmates.

The lack of continuity of flow of information between officers tasked with the day to day operations of the jail, particularly those related to medical problems.

The absence of a full-time person working within the jail to monitor the jail's functions and

Page 14 - ORDER

supervise the care of inmates.

A jury could find that some of these asserted deficiencies dovetailed with the failures that contributed to Cooper's death. For example, although EMTs instructed officers to ensure Cooper was hydrated, no one logged his fluid intake and no one was tasked with reviewing such logs to ensure adequate hydration. Another example is Gagner's failure to log or communicate to other officers performing jail functions information about Cooper vomiting blood. There is no evidence in the record that anyone logged or communicated any information regarding Cooper's dramatic weight loss over just nine days at the jail. In addition, a jury could find that the lack of a full time employee at the jail to supervise and monitor inmates contributed to Cooper's death as he steadily deteriorated while incarcerated without any one individual monitoring, taking responsibility for, or otherwise taking ownership for his care and medical needs. A jury could also find that the City prioritized costs concerns to a degree that its officers were collectively indifferent to Cooper's deteriorating medical condition and serious needs.

### Conclusion

As discussed above, there are material factual issues present that must be resolved by a jury and which preclude summary judgment for defendants. The plaintiff is not bound by the assertions of the defendants that in their view the decedent was not suffering from a serious medical need that mandated professional medical evaluation and treatment under the standards applicable pursuant to the Eighth Amendment of the Constitution, and is entitled to probe those assertions before a jury under the facts and circumstances of this case. There are times when it is preferable to proceed to

Page 15 - ORDER

a full trial on the claims because such will develop a more complete record which will provide a more substantial basis for decision.[5]    See Anderson v. Liberty Lobby, Inc, , 477 U.S. 242, 255 (1986); Anderson v. Hodel, 899 F.2d 766, 770-771 (9th Cir. 1990).

Defendants' motion (#17) for summary judgment is denied.

DATED this **21** day of August, 2014 .

_____
THOMAS M. COFFIN
United States Magistrate Judge

_____

[5]For example, there is nothing in the record before the court that addresses the symptoms that would have likely been exhibited by Cooper before his death given the advanced bacterial pleuritic process in his lungs noted by Dr. Davis in his autopsy report.   A trial will provide an opportunity to fully explore this and other pertinent issues.  In examining the record before me, I note that the jail log for the evening and morning hours immediately preceding his death consistently reflect "C4" entries by the officers in connection with their inmate checks.

Page 16 - ORDER